M. L. McVEY, Respondent, v. H. L. BARKER, Appellant.

St. Louis Court of Appeals, February 25, 1902.

1. **Animals:** WHEN OWNERS LIABLE FOR RUNNING AT LARGE. Touching the restraint of animals, there is a distinction between a law making penal the act of permitting an animal to run at large, and a law authorizing the impounding of the animal itself when found at large in a public street. Under the former

McVey v. Barker.

law an owner is not liable where his animal escapes without his fault; but under the latter law the animal at large in the streets may be taken up without regard to any fault on the part of the owner. The case at bar is governed by the latter law and is distinguishable from Spitler v. Young, 63 Mo. 42.

2. ———: CHARGEABLE WITH COST OF IMPOUNDING, WHEN. Animals running at large, when lawfully impounded, may be subjected to reasonable charges for their restraint under valid municipal ordinances.

3. ———: POLICE POWER, WHEN CAN BE EXERCISED. Under the charter of Laddonia, a city of the fourth class, an ordinance authorizing the impounding of horses running at large therein is a valid exercise of police power, irrespective of any fault or negligence of the owner in allowing the animals to be at large.

4. ———: MARRIED WOMAN, WHEN SHE CAN SUE IN HER OWN NAME. The case assumes that a married woman may maintain a suit in her own name for damages sustained by conversion of her horses.

5. Evidence. When incompetent evidence has been admitted without objection it must be allowed such weight as the triers of fact choose to give it.

6. Instruction: ERROR. It is error to instruct the jury on a contested issue so as to exclude testimony tending to show hostile feeling toward the losing party on the part of an important witness for the adverse litigant.

7. Error: WHEN PREJUDICIAL: PRESUMPTION. Error is presumptively prejudicial. If one claims it to be harmless that fact must be established to the satisfaction of the court.

8. Appeal: BEFORE FINAL JUDGMENT, EFFECT OF. An appeal by one of two defendants before final judgment as to both, is premature and is properly dismissed.

Appeal from Audrain Circuit Court.—*Hon. Elliott M. Hughes*, Judge.

REVERSED AND REMANDED.

*P. H. Cullen* and *W. H. Logan* for appellant.

McVey v. Barker.

(1)   The defendant Barker, and the city of Laddonia, having been sued jointly and a separate and final judgment having been rendered in favor of the city, it was not in the power of the court to render another final judgment in the same case.   R. S. 1899, sec. 282; Sater v. Hunt, 75 Mo. App. 470; Beshears v. Vandalia Banking Ass'n, 73 Mo. App. 293; Henry v. Gibson, 55 Mo. 570; Holbom v. Naughton, 60 Mo. App. 103.   (2)   The husband of the plaintiff was an incompetent witness.   There was a failure to prove an agency of such a character as would authorize the husband to testify to such matters as he was interrogated about.   Flaunery v. Railroad, 44 Mo. App. 396.   (3)   The court erred in failing to instruct the jury that they were at liberty to ascertain what if any special lien or interest the defandant had in the property.   The instructions given at plaintiff's request excluded the possibility of such a finding and were therefore error. Delworth v. McKelvey, 30 Mo. 149; Gilham v. Kerone, 45 Mo. 487; Bontill v. Warne, 62 Mo. 350; Kerr v. Drew, 90 Mo. 147; Gregory v. Lavener, 38 Mo. App. 527.   (4)   Plaintiff's third instruction is erroneous in that it authorizes the jury to find for plaintiff whether she used ordinary care to restrain her stock or not.   If the horses were out without her knowledge, then the said instruction authorizes a recovery.   It was her duty to use reasonable care to restrain her stock, and her negligent ignorance of their escape has the same force and effect as positive knowledge.   The instruction certainly should have required the jury to find she used ordinary care to restrain her stock, but under this instruction the jury was bound to find for her in all events unless she knew the horses were out, and the jury could not find her in fault until they found she had knowledge of the escape and failed to make a reasonable effort to reclaim them.   Such is not the law.   Speller v. Young, 63 Mo. 42; Howlet v. Erie, 79 Mo. App. 657.

*W. A. Edmonston, George Robertson* and *D. A. Murphy* for respondent.

(1) The respondent herein lived upon a farm and not within the corporate limits of the city of Laddonia and the horses escaped or were turned out of the pasture on said farm without any negligence on the part of the plaintiff and escaped therefrom by reason of being let out through a gate by some unknown third party other than member of her family and without the knowledge or consent of this plaintiff; that after learning of their escape or that they had been turned out, due diligence was employed by her to overtake them. Howlett v. Erie, 79 Mo. App. 656; Spitier v. Young, 63 Mo. 42. (2) It is evident from an examination of the testimony, that the four horses in question did not get out of the pasture and onto the public streets of Laddonia for any fault on plaintiff's part, or her carelessness or negligence in any way, and if she and her husband used ordinary care and diligence in preventing their stock from getting on the highways and public streets, the city of Laddonia nor any of its officers had no right whatever to take up and impound the same and demand fees for so taking. Rockwell v. Nearing, 35 N. Y. (8 Tiff) 302; Campbell v. Evans, 54 Barb. 566; 52 N. Y. (7 Sick) 62; Fox v. Dunckle, 55 Barb. 431. (3) Husband is a competent witness upon proof that he was acting as wife's agent and in this case it is proven by plaintiff that he was the agent of his wife. Reno et al. v. Kingsbury, 39 Mo. App. 240; Sauter and Adams v. Scrutchfield, 28 Mo. App. 150; R. S. 1899, sec. 4656.

BARCLAY, J.—This is a statutory action in the nature of replevin. Plaintiff, a married woman, in her petition claims four horses (each described particularly) of the total value of $275, and charges that defendant wrongfully and maliciously took the animals from her possession, November 20, 1899, and unlawfully detained them, to her damage in the

sum of $500. Then follow the usual allegations under the statute on the subject (R. S. 1899, sec. 7479) and a prayer for the return of the property (or its value) and damages.

Originally the defendants were the city of Laddonia and Mr. Barker, the city marshal thereof.

The circuit court sustained a demurrer of the city to the petition. The plaintiff appealed to the St. Louis Court of Appeals from that ruling. That appeal was dismissed because taken prematurely (McVey v. Barker, 88 Mo. App. 515). The other defendant, Mr. Barker, made answer justifying the detention of the animals under ordinances of the city of Laddonia, some of the material parts of which are as follows:

"Sec. 1.   *What not to run at large.*—Hereafter no sheep, goats, or hogs of any description; or horses, mules, asses, or cattle shall be permitted to run at large in this city.   All sheep, goats, or hogs of any description, or horses, mules, asses, or cattle found running at large within the limits of the city shall be taken up by the city marshal, and it is hereby made the duty of said marshal to take up all such stock found running at large, and place any such stock in some secure pen or pound provided for that purpose."

The ordinances further enact that, whenever animals of the kind enumerated shall be taken up, it shall be the duty of the marshal to sell the same to the highest bidder for cash, at public auction, when so ordered by the board of alderman, after five days notice in a newspaper of the city, or by posting in public places therein. From the proceeds of sale the expenses of taking up, advertising and selling the animal are to be deducted and the residue paid over to the owner upon satisfactory proof by any claimant of his right as such. If no owner claims, within thirty days after the sale, then the proceeds (after deducting said expenses) shall be paid into the city treasury. The marshal is further authorized to release the stock to the owner before sale, upon payment of the expenses authorized by the ordinance.

An itemized schedule of fees for taking up, feeding, advertising and selling the stock is contained in the ordinances. So far as concerns horses (the subject of this suit) the charge "for taking up" is stated to be fifty cents per head; for advertising, twenty-five cents per head, and for selling, ten cents per head.

The defendant in his answer states that the city of Laddonia is a city of the fourth class, under the general laws of Missouri, and was such at all the times mentioned in plaintiff's petition; that the animals were taken up while running at large in said city by the defendant Barker, in discharge of his duty as city marshal; that, after they were taken up, said animals were sold by order of the board of aldermen, after the notice prescribed by the ordinance had been given and that defendant had tendered to plaintiff the proceeds of said sale, less the actual expenses enumerated in the ordinance.

We are not quoting literally from the answer, but merely stating its substance.

The reply admits that defendant Barker was city marshal, and that he took up and sold the animals alleged; it denies the other allegations of the answer.

The cause was tried with the aid of a jury who found in favor of the plaintiff and assessed her damages at $100. Judgment was rendered accordingly; whereupon defendant, Mr. Barker, appealed to this court.

The judgment against Mr. Barker says nothing whatever about the disposition of the case as to the city of Laddonia. A judgment final in form had been previously entered on the demurrer in favor of defendant, the city of Laddonia, at an earlier stage of the proceedings, prior to the abortive appeal mentioned.

The most important facts in the case are admitted by both parties.

Mrs. McVey, the plaintiff, is a married woman living with her husband and family on a farm which is situated within the

corporate limits of Laddonia.    She was the owner of the
horses in question.    They escaped from her premises (in a
manner to which we will refer later) November 20, 1899, and
were discovered by Mr. Barker, defendant, about seven o'clock
on the morning of that day, loose on the streets of Laddonia.

Mr. Barker at that time was city marshal, constable, city
clerk and sexton of the city cemetery, according to his own
testimony.    He took charge of the animals in his capacity as
city marshal and detained them in the city pound.

About nine o'clock of the same day, plaintiff's husband
interviewed the defendant about the horses, and learned that
they had been taken up and would be released upon payment
of the charges therefor (two dollars).    The charges were not
paid.    Plaintiff claimed the right of possession of the horses
without any such payment.    She brought the present suit
within a day or two after the horses were impounded.    Where-
upon the defendant proceeded as city marshal, under directions
from the board of aldermen, to sell the animals (according to
the terms of the ordinances mentioned) to defray the unpaid
expenses incurred on their account, as specified in said ordi-
nances.

There is a large amount of contradictory evidence in the
record, some features of which should be mentioned.

The plaintiff and several witnesses in her behalf gave evi-
dence tending to prove that the horses escaped from her farm
in the night, through a gate which had been properly closed
before the family retired; that the fences inclosing the lot
where the horses were kept were in good condition and suffi-
cient to prevent the escape of the animals.

An inference which may properly be drawn from plain-
tiff's testimony is that some interloper opened the gate during
the night and thereby set the horses free, without any negli-
gence on the part of plaintiff.

On the side of the defendant, there is testimony to show

that plaintiff's fences were so negligently kept that the horses could have escaped at several points.

The value of the horses was testified to by several of plaintiff's witnesses at sums largely in excess of the recovery in the circuit court, while on defendant's part there was evidence to show that the horses brought their fair market value, $107.50, at the auction sale; that the total expense, according to the schedule mentioned in the ordinance was $19.40, leaving a surplus of $88.10. Defendant testified that he tendered that sum to plaintiff before the trial. The fact of tender, however, was disputed and need not further be referred to.

During the progress of the trial plaintiff's husband, Mr. McVey, was examined as a witness on her behalf. He testified to having made a demand of the city marshal, the defendant, for the horses after they had been impounded. Plaintiff had testified that her husband was authorized to act as her agent in that behalf. He testified to a number of important facts bearing on the merits of the controversy, besides the demand aforesaid, namely: as to the good condition of the fences around plaintiff's lot where the horses had been kept, the tracks through the gateway, and the value of the horses. To several of these points in his testimony objection was interposed on the ground of his competency because of relationship to plaintiff, but all those objections were overruled.

One of defendant's witnesses, Mr. Syler, testified, without objection, at some length, to a number of statements by Mr. McVey concerning the impounding of the horses after they were in possession of the defendant Barker. Those statements tended to show a hostile feeling on the part of Mr. McVey toward defendant, and a reckless disregard for the city of Laddonia and its municipal authority; for example, that "they dare not do anything with his horses, they had no law to do anything;" that "he expected to bring suit and sell the whole town and put it in oats"—that "he could let his horses run out just as much as he pleased, and that he had them just

where he wanted them," and a good deal more of the same general character.

Another witness for defendant (Mr. Torreyson) testified, without objection, that Mr. McVey, on the day after the horses were taken up, was offered by witness the two dollars charges to redeem the horses and to smooth over the trouble, that McVey refused the offer and said with an oath, for witness to keep the money, that he "had it in for Barker and was going to give it to him;" that he had won one lawsuit and guessed he could win another.

If the statements attributed by these witnesses to Mr. McVey were credited they would have a natural tendency to weaken the force of his evidence.

Mr. McVey took the stand in rebuttal to deny the statements ascribed to him by witness Torreyson.

1. Among other instructions given on behalf of the plaintiff was the following:

"The court instructs the jury that they will disregard all evidence of statements and conversations made by C. E. McVey in regard to the horses which were made after the horses were taken up by the defendant Barker."

The "C. E. McVey" named in the instruction is the plaintiff's husband, already mentioned.

The instruction may have been intended to refer to his statements as agent for the plaintiff after the horses were taken up. But its language is capable of a much broader significance. The statements and conversations referred to by the witnesses, Syler and Torreyson, came in evidence without any objection on the part of plaintiff. They had a material bearing on the motive and candor of the testimony of Mr. McVey and could not properly be eliminated from the case by an instruction after their admission as above described.

Even incompetent evidence, when it has been admitted without objection, must be allowed to have such weight and force as the triers of fact may see fit to accord to it. Farber

McVey v. Barker.

v. Railroad, 139 Mo. 272. Evidence indicating bad motive or bad feeling of a witness stands on the same footing in this regard, and where testimony showing on its face its objectional nature is admitted without objection, it may not afterwards be excluded by instruction. The reason of this rule has been stated to be that it would be unfair for a party to experiment on the effect of such testimony by letting it in without objection, and then, on discovering its disadvantages, to seek to exclude it by instructions. Maxwell v. Railroad, 85 Mo. 95; Singer Mfg. Co. v. Clay, 53 Mo. App. 412.

Nor can it fairly be said that the error of the instruction was harmless. Its effect can not be accurately determined.

Error is presumptively prejudicial. If a suitor claims it to be harmless, it devolves upon the claimant to establish that claim to the satisfaction of the court. State v. Taylor, 118 Mo. 161; Walton v. Railroad, 40 Mo. App. 544. That has not been done in the present case. We are, therefore, bound to view said error as injurious to the interests of the defendant.

2. The case was submitted in the trial court on the theory that plaintiff was entitled to recover the horses if they escaped from her premises without any omission of ordinary care in the restraint of the animals, or of "requisite diligence" in attempting to reclaim them, after they had escaped. As the judgment must be reversed for the reason already given, it is appropriate to express our view of the substantial merits of the case as a guide in further proceedings herein.

The trial court was obviously endeavoring to follow the doctrine of Spitler v. Young, 63 Mo. 42. The circumstances of that case were peculiar and they differ essentially from those presented in the case at bar. Spitler, the plaintiff, who claimed the hogs which wandered into the town of Trenton, was declared not guilty of any fault because the pen in which he had kept his hogs was washed away by a flood, "a power over which plaintiff had no control," in other words by the act of God. It

further appeared that the plaintiff made every requisite effort to recapture the animals; and, though they were "physically found" in the streets of Trenton, it was held that the spirit of the ordinance of that town did not reach them or their owner for the purpose of punishment. Therefore, a recovery of the hogs by plaintiff was sustained.

The escape of the hogs in the first place from the owner's premises was viewed as unavoidable, and his attempt to reclaim them exhibited "requisite diligence." So the court held that plaintiff was not subject to the penalties imposed by the local ordinance under the charter of Trenton (Laws 1874, p. 409).

Laddonia is governed, however, by the general charter for cities of the fourth class which confers on the board of aldermen certain broad powers in relation to this subject, viz.:

They may "regulate or prohibit the running at large of cattle, hogs, horses, sheep, goats and other animals and domestic geese, and cause such as may be running at large to be impounded and sold in such manner and time as may be provided by ordinance; they may also provide penalties for the owners who shall permit such animals or geese to run at large. The board of aldermen may also provide for the erection of all needful pounds, pens and buildings for the use of the city within or without the city limits, and appoint and compensate keepers thereof and establish and enforce rules governing the same." R. S. 1899, sec. 5959.

There is a distinction to be noted between a statute which attaches a penalty to the act of "*permitting* animals to run at large" and one which makes it the duty of some official of a municipality to take up an animal found running at large in the public streets. Where the gist of the offense defined by the law is permitting an animal to run at large it is obviously necessary to show some negligence, at least, on the part of the owner to bring the latter within the reach of the penalty denounced. But, where there is due sanction for such local regulations, it is competent for a municipality to ordain that ani-

mals found running at large may be taken up, irrespective of the question whether the owner is at fault or not in permitting them to be at large on the public street.

The right by ordinance to exercise the police power of a municipality in taking up stray animals is beneficial, not merely for the preservation of good civic order, but also for the benefit of the owner of such animals which would be exposed to greater risk of destruction by being left to wander than by being impounded at a small expense.

The above-quoted provision of the charter of cities of the fourth class clearly defines the distinction referred to. It authorizes the impounding of animals running at large and charges upon them the expense thereof, which the owner may pay at any time before the sale authorized in event the costs be not promptly forthcoming. But no penalty is to be imposed upon the owner except when he "shall *permit*" such animals to run at large.

The language of the law governing Laddonia shows an obvious purpose to establish a different rule from that declared in Spitler v. Young, 63 Mo. 42, so far as concerns cities of the fourth class. The right to impound horses found at large in the public street is distinctly given to the city. The right to exert that power is severed with equal distinctness from the right to impose a penalty on the owner for permitting the animal to run at large.

The Legislature evidently intended to invest these municipalities with adequate authority to keep stray animals out of the public thoroughfares, irrespective of any inquiry why they got there. So far as concerns the safety, good order, cleanliness and appearance of the street, it is of no consequence how the animals came to be at large. The city has authority to remove them, to take care of them for whom it may concern, and to make a reasonable charge for so doing, in the exercise of its police power. That animals running at large in city streets may be impounded and reasonable charges for their

restraint may be enforced, under the sanction of proper charter authority, was expressly held by this court in Schell v. Murray, 49 Mo. App. 233. The same doctrine has been lucidly expounded elsewhere. Sloan v. Hubbard, 34 Ohio St. 583; Paris v. Hale, 13 Tex. Civ. App. 386 (35 S. W. Rep. 333).

3. For the error already pointed out, a new trial should be had, so it is not necessary to refer to any other assignment of error.

The judgment is reversed and the cause remanded. *Bland, P. J.*, and *Goode, J.*, concur.